[No. A088919. First Dist., Div. Four. Dec. 19, 2000.]

DOUGLAS SUTHERLAND et al., Plaintiffs and Appellants, v.
CITY OF FORT BRAGG, Defendant and Respondent.

**COUNSEL**

Jackson Law Offices and Jone Lemos Jackson for Plaintiffs and Appellants.

Meyers, Nave, Riback, Silver & Wilson, Andrea J. Saltzman, Clifford F. Campbell and Adam U. Lindgren for Defendant and Respondent.

**OPINION**

**SEPULVEDA, J.**—In 1977, plaintiffs Douglas and Jill Sutherland bought the Barracks Mall in downtown Fort Bragg, a two-story commercial and residential building that occupies the lot on which it is situated, up to the perimeter of the property line. At that time and continuing to 1997, the lot adjoining Barracks Mall to the south, owned by David Codling (Codling), was vacant. Owing to that fact, tenants in the upstairs apartments on the

south side of Barracks Mall received light and air through the south-facing windows and, according to allegations in plaintiffs' second amended complaint, anticipated using the windows and the adjacent vacant lot as a means of escape in the event of a fire or similar emergency.

Conditions changed, however, in 1997 when defendant City of Fort Bragg (City) granted Codling's application for a building permit to erect a two-story structure on his lot extending, like plaintiffs' adjoining building, to his property line, only inches away from the Barracks Mall building. The effect of the building permit and Codling's subsequent erection of a structure on his lot was to cut off light and air into the windows of the southern-facing Barracks Mall apartments and to end the use of Codling's lot as a potential fire escape for apartment residents. Codling's construction of a building had other untoward effects on plaintiffs, according to their second amended complaint. Some tenants vacated their apartments; others were asked to vacate by plaintiffs, given the dangers created by the absence of a second fire exit. In time, plaintiffs allege, their loss of rental income left them unable to pay the mortgage installments on the building and they eventually lost ownership of it in foreclosure proceedings.

In 1998, after the City denied an administrative claim for compensation for their losses, plaintiffs filed this action for damages, pleading two causes of action against Codling and a single claim for relief against the City. (Codling was later dismissed as a party, leaving the City as the sole defendant.) After the initial pleadings had been filed and a date for trial of the cause set, the City moved the superior court for permission to file an otherwise untimely motion for judgment on the pleadings. (See Code Civ. Proc., § 438, subd. (e).)[1] This was granted and, in due course, the City's motion was filed. Plaintiffs filed an opposition. After hearing oral argument, the superior court filed an order granting the motion and subsequently entered a final judgment for the City. Plaintiffs timely prosecuted this appeal. We affirm.

DISCUSSION

In seeking reversal of the trial court's order and judgment, plaintiffs rely on a provision of the California Tort Claims Act, which provides as follows: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the

---

[1]"No motion [for judgment on the pleadings] may be made pursuant to this section if a pretrial conference order has been entered . . . or within 30 days of the date the action is initially set for trial, whichever is later, *unless the court otherwise permits.*" (Code Civ. Proc., § 438, subd. (e), italics added.)

public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Gov. Code, § 815.6.)[2] Plaintiffs alleged that the City had a mandatory duty imposed by the site and architectural review (SAR) provisions of chapter 18.75 of the Fort Bragg Municipal Code to conduct a review of Codling's application for a building permit; that no review under the SAR provisions was ever conducted; that if it had been, Codling would not have received a building permit or, alternatively, the permit would have been modified to protect plaintiffs' property interests; and that the City's failure to discharge its mandatory review duty under the SAR provisions caused plaintiffs to lose their Barracks Mall property to foreclosure.

The City counters these assertions by arguing that, despite the language of the municipal code provision (e.g., Ft. Bragg Mun. Code, former § 18.75.020 ["The site and architectural review committee *shall* review and make written recommendations . . ." (italics added)]), SAR review is discretionary rather than mandatory; that if such review had been undertaken by the City, a building permit substantially like the one granted Codling would have issued in any case; and that, in the end, the absence of SAR review of Codling's building plans was not the proximate cause of plaintiffs' losses.

Plaintiffs also advance what they contend is a second duty incumbent on the City, one they also argue was mandatory. Provisions of the Uniform Fire Code (as adopted by the City in Ft. Bragg Mun. Code, § 15.05 et seq.) require every residential building to have a minimum of *two* emergency exits. (Uniform Fire Code, pt. IX, div. I, appen. 1-A, § 2.1 ["**Number of Exits.** Every floor above the first story used for human occupancy shall have access to at least two separate exits . . . ."].) Because construction of Codling's building effectively closed off use of the second floor windows of the Barracks Mall as a fire exit, the building was placed in violation of this provision of the Uniform Fire Code. City fire officials, plaintiffs argue, were under a mandatory duty to enforce the two-exit provision of section 2.1 of the Uniform Fire Code and their failure to do so led to plaintiffs' loss of their property. The City's rebuttal to this second claim tracks its response to plaintiffs' claim for relief under the SAR enactment. That is, the City argues it had no mandatory duty within the meaning of section 815.6 to maintain fire exits on plaintiffs' property or to prevent Codling from obstructing those exits by building on his land. Moreover, the City argues the Uniform Fire Code's exit requirements were not intended to prevent the kind of loss plaintiffs allege they suffered.

As will appear, we conclude the City prevails on all three of its defenses under section 815.6, and that the judgment appealed from must be affirmed.

[2] All statutory references are to the Government Code unless otherwise stated.

There is no dispute between the parties regarding what plaintiffs are required to show in order to establish the City's liability under section 815.6. ██ " 'Government Code section 815.6 contains a three-pronged test for determining whether liability may be imposed on a public entity: (1) an enactment must impose a mandatory, not discretionary, duty [citation]; (2) the enactment must intend to protect against the kind of risk of injury suffered by the party asserting section 815.6 as a basis for liability [citations]; and (3) breach of the mandatory duty must be a proximate cause of the injury suffered. [Citations.]' " (*Thompson v. City of Lake Elsinore* (1993) 18 Cal.App.4th 49, 54 [22 Cal.Rptr.2d 344].)

I.

SAR REVIEW: MANDATORY DUTIES AND ADMINISTRATIVE DISCRETION

Two recent opinions by the California Supreme Court discussing so-called mandatory acts governmental tort liability under section 815.6 bear directly on the issues before us in this case. In *Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490 [93 Cal.Rptr.2d 327, 993 P.2d 983] (*Haggis*), the court discussed the test for establishing liability under section 815.6. "First and foremost," the court wrote, "application of section 815.6 requires that the enactment at issue be *obligatory*, rather than merely discretionary or permissive, in its direction to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken. [Citation.] *It is not enough, moreover, that the public entity . . . ha[s] been under an obligation to perform a function if the function itself involves the exercise of discretion.* [Citation.]" (22 Cal.4th at p. 498, first and second italics in original.)

The opinion in *Haggis*, in turn, relied on *Creason v. Department of Health Services* (1998) 18 Cal.4th 623 [76 Cal.Rptr.2d 489, 957 P.2d 1323] (*Creason*), where the court affirmed a ruling sustaining a demurrer to a claim the defendant agency was liable for failing to diagnose and report that a minor suffered from congenital hypothyroidism. (See *Haggis, supra,* 22 Cal.4th at p. 498.) Speaking to the question of governmental liability for discretionary acts under section 815.6, the *Creason* court said that "Although . . . the question of state immunity from suit is a separate issue . . . cases . . . involving claimed immunity for 'discretionary' acts . . . obviously are instructive in determining whether 'mandatory acts' liability should be imposed. As we stated in *Johnson* [*v. State of California* (1968) 69 Cal.2d 782, 793-794 [73 Cal.Rptr. 240, 447 P.2d 352] (*Johnson*)], this immunity is usually extended to the 'planning' rather than the 'operational' levels of decisionmaking, i.e., 'those areas of quasi-legislative policy-making which

are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision.' " (*Creason, supra,* 18 Cal.4th at p. 633, italics omitted.) After reviewing the statute that purportedly served as the predicate for liability under section 815.6, the *Creason* court wrote that "the general statutory principles and policy goals plaintiffs cite . . . fail to comprise a mandatory duty . . . and that the Director's allegedly negligent exercise of discretion . . . will not support a cause of action under Government Code section 815.6." (*Creason, supra,* 18 Cal.4th at p. 635.)

■ Like the court in *Haggis,* we also read *Creason* as endorsing the view that, *for purposes of establishing damages liability under section 815.6,* if the predicate enactment confers the exercise of discretion on government officials, the use of "shall" and like words will not alone support liability under the California Tort Claims Act. (See also *Morris v. County of Marin* (1977) 18 Cal.3d 901, 906-911 [136 Cal.Rptr. 251, 559 P.2d 606]; *Johnson, supra,* 69 Cal.2d at pp. 793-794; *Nunn v. State of California* (1984) 35 Cal.3d 616, 622 [200 Cal.Rptr. 440, 677 P.2d 846]; *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 981-983 [42 Cal.Rptr.2d 842, 897 P.2d 1320].) In other words, *Creason* and *Haggis* stand for the proposition that even where language in the predicate enactment *appears* mandatory, if significant discretion is required to carry out any duty imposed, that duty is not mandatory *within the meaning of section 815.6* and thus a breach of the duty will not support tort liability.

A credible argument can be made—and it is made in plaintiffs' briefing—that these cases do not overturn the orthodox rule that, even where administrative discretion is implicated, the duty to exercise that discretion *is* mandatory. (Cf. *Thompson v. City of Lake Elsinore, supra,* 18 Cal.App.4th 49, 58 ["The critical point . . . is that . . . the building official had *already exercised its discretion* . . . . Accordingly, [he] retained no further discretion to withhold the certificate . . . ." (italics in original)].) We are not persuaded, however. Language in both *Creason* and *Haggis* tells us expressly that, for purposes of determining damages liability (rather than, say, equitable relief), a discretion inherent in the predicate enactment bars recovery under section 815.6. (*Haggis, supra,* 22 Cal.4th at p. 498 ["It is not enough, moreover, that the public entity . . . have been under an obligation to perform a function if the function itself involves the exercise of discretion. (*Creason v. Department of Health Services* [, *supra,*] 18 Cal.4th 623, 631-633 . . . .)"].)

■ We turn, then, to a consideration of the nature of SAR review to determine whether the committee is conferred discretion in carrying out its

duties. Reading the text of the SAR provision almost at random, it is beyond serious argument that the committee's review of proposed building plans is, to paraphrase Judge Cardozo, " 'instinct with [discretion].' " (*Wood v. Duff-Gordon* (1917) 222 N.Y. 88, 91 [118 N.E. 214, 214].) Beginning with the "Intent and purpose" section of chapter 18.75 of the City's Municipal Code, the enactment states that the "procedures and authority for the review and approval by the [SAR] committee of site plans, architectural elevations . . . and landscaping plans are established by this chapter in order to achieve the following purposes: . . ." There follows the recitation of purposes, e.g., "To improve the general standard of orderly development of the city . . . . [¶] To preserve the natural beauty of the town[']s site and setting . . . . [¶] To ensure that the location and configuration of structures are visually harmonious with their sites and with the surrounding sites and structures . . . and to create an internal sense of order to provide [a] desirable environment for occupants, visitors, and the general community. [¶] . . . [¶] To ensure that plans for the landscaping of open spaces conform with the requirements of this title, and that they provide visually pleasing settings for structures . . . . [and] blend harmonious[ly] with the natural landscape . . . ." (Ft. Bragg Mun. Code, former § 18.75.010.)

It is true, as plaintiffs point out, that the enactment mandates the committee to perform some functions. But this mandatory language is coupled directly with subjective, general, and advisory duties. Under "Mandatory findings," for example, the SAR "committee *must* make the following findings: [¶] . . . [¶] General site considerations . . . have been designed to provide a desirable environment . . . . [¶] Architectural considerations including . . . building materials, colors, . . . exterior lighting and signing . . . insure the compatibility of this development with its design concept . . . . [¶] . . . Provisions for irrigation, maintenance and protection of landscaped areas and similar elements have been considered to ensure visual relief, compliment buildings and structures and to provide an attractive environment for enjoyment of the public." (Ft. Bragg Mun. Code, former § 18.75.060, italics added.)

Moreover, the committee's role is wholly advisory: "The [SAR] committee shall review and make written recommendations . . . to the technical advisory committee prior to any review or public hearing . . . ." (Ft. Bragg Mun. Code, former § 18.75.020). "All comments from the [SAR] committee shall go before the technical advisory committee or scenic review committee for action . . . ." (Ft. Bragg Mun. Code, former § 18.75.070.) In short, reviewing the text of the code provisions, we conclude that the City's site and architectural review committee exercises administrative powers that are general in scope, vague in formulation and advisory in function; powers that

qualify, in a word, as discretionary. (See *Creason, supra*, 18 Cal.4th at p. 634 ["[T]he statutory 'guiding principles' on which plaintiffs base their cause of action are themselves quite general and broad and are subject to considerable interpretation"].)

## II.

### *Mandatory Duties and the Zone of Protected Interests*

In examining the second of the three-pronged test for mandatory acts liability under section 815.6, we revert again to the high court's recent opinion in *Haggis, supra*, 22 Cal.4th 490. "Second, but equally important," the court wrote, "section 815.6 requires the mandatory duty be 'designed' to protect against the particular kind of injury the plaintiff suffered. The plaintiff must show the injury is ' "one of the consequences which the [enacting body] sought to prevent through imposing the alleged mandatory duty." ' [Citation.] Our inquiry in this regard goes to the . . . *purpose* of imposing the duty. That the enactment 'confers some benefit' on the class to which plaintiff belongs is not enough; if the benefit is 'incidental' to the enactment's protective purpose, the enactment cannot serve as a predicate for liability under section 815.6. [Citation.]" (*Id.* at p. 499, italics and brackets in original.)

In *Haggis*, the court concluded that the purpose of a Los Angeles Municipal Code provision requiring the recordation of a certificate of substandard condition for real property subject to landslides was "to encourage the landowner to undertake necessary stabilization work, for if he . . . does not do so, a recorded certificate of substandard condition will seriously impair the value of the property for possible sale or security. True, the recordation also may provide warning to potential purchasers and lenders . . . but that effect is aptly described as 'incidental' [citation] to the ordinance's enforcement goals. [The ordinance] exists to protect the public against unsafe building and land conditions, not to regulate the marketing of real estate." (*Haggis, supra*, 22 Cal.4th at p. 503.)

Again, reading the text of the SAR provisions, it is evident that the dominant, the overriding, and quite possibly the exclusive purpose of review of building plans by the SAR committee is aesthetic and scenic, rather than the preservation of access to light and air from vacant adjoining lots or preventing the obstruction of windows so they may be used as fire exits. As our review of the SAR provisions above makes clear, the express purpose of the enactment is to "preserve the natural beauty of the town[']s site and

setting . . . . [¶] To ensure that the location and the configuration of structures are visually harmonious with their sites . . . . [¶] . . . [¶] To ensure that plans for the landscaping of open spaces . . . provide visually pleasing settings . . . ." (Ft. Bragg Mun. Code, former § 18.75.010.)

Indeed, even the mandatory findings imposed on the committee look to the overriding purpose of providing "a desirable environment," of reviewing "[a]rchitectural considerations," including "colors . . . screening . . . and exterior lighting and signing," and of assessing "[g]eneral landscape considerations, including the location, type, size, color, texture and coverage of plant materials." (See, e.g., Ft. Bragg Mun. Code, former § 18.75.060.) In short, as the City's brief aptly characterizes it, "[t]he [SAR committee] is not directed to consider whether proposed buildings will conform to the Uniform Fire Code or any other code establishing safety standards. It is only directed to consider how the buildings *look*." We are satisfied that, given the overriding scenic and aesthetic focus of the enactment, it was not designed to protect against the kind of injuries of which plaintiffs complain.

### III.

*Mandatory Duties and Proximate Causation*

■ The third and final prong required to establish governmental liability under section 815.6 of the California Tort Claims Act is the familiar requirement of any claim for relief in tort—causation in fact. As to this requirement, the failure of the SAR committee to review Codling's building plans for site and architectural conformity was not the legal cause of the injury plaintiffs allege. Examination of this requirement brings us full circle, back to the initial consideration of the discretion-laden duty of the SAR committee under the City's Municipal Code. For it is precisely the subjective, discretionary and, in the end, *purely advisory* role of the committee that suggests the absence of causation in the City's failure to have the Codling permit application submitted for review by the SAR committee. As noted, the role played by the committee is both entirely advisory and narrowly focused on aesthetic values. Given those causative limitations, the likelihood that, had SAR review of the Codling application occurred, plaintiffs would have secured the relief they now seek appears highly remote. According to representations made by the City in its brief, under Fort Bragg's current zoning, Codling could lawfully build up to the property line and no setbacks were required. (See Ft. Bragg Mun. Code, § 18.21.040, subd. D.) In any event, because the chain of causal events leading administratively to the

relief plaintiffs seek is highly problematical, the failure of SAR review was not the legal cause of the injuries plaintiffs allege.

## IV.

### *The Fire Code's Second Exit Provision*

■ As noted, plaintiffs also contend the provision of the Uniform Fire Code requiring all second story residences to have a minimum of two exits imposed a mandatory duty on the fire chief to prohibit approval of Codling's application for a building permit. This was so, the argument runs, because as constructed the building obstructed the use of second-story windows in the Barracks Mall as a second emergency exit required by the code. Again, we find the reasoning of the Supreme Court in *Haggis, supra,* 22 Cal.4th 490, and *Creason, supra,* 18 Cal.4th 623, to be dispositive. In both, the court held that despite the presence of some mandatory language in the predicate enactment, "[g]iven the pervasively discretionary nature of the City's authority to withhold a permit, . . . we discern in [the] Municipal Code, . . . despite its use of 'shall,' no clear intent to mandate that the City, without the exercise of discretion or judgment, deny a permit if no affidavit has been recorded." (*Haggis, supra,* 22 Cal.4th at p. 506; see also *Creason, supra,* 18 Cal.4th at pp. 631-633.)

Indeed, if anything, despite the use of mandatory language, the case for the exercise of discretion and judgment by the City's fire chief is even clearer than that given the SAR committee. As the City points out, while the chief has broad powers in enforcing the fire code, he also exercises considerable discretion in deciding how it should be applied. More importantly, the City's enforcement powers under the Uniform Fire Code do not impose upon it any duty to shoulder the correction of code violations; that is the responsibility of the property owner. Aware of a violation of the code's exit provisions, the chief has an array of remedies at his disposal under the code, all involving the exercise of official discretion. These enforcement remedies include orders requiring an offending use to cease, declaring a building a public nuisance to be abated or, in his discretion, declining any enforcement measures at all. (See U. Fire Code, §§ 103.4.1.1, 103.4.1.3, 103.4.5 & 1201.1.) What they do not encompass is action by the chief denying a building permit for a neighboring landowner.[3]

---

[3]City also argues that several immunities conferred by the California Tort Claims Act apply in this case. Because we have concluded no claim for relief under Government Code section 815.6 is stated by plaintiffs, we do not reach the issue.

## DISPOSITION

The judgment of the superior court is affirmed.[4]

Hanlon, P. J., and Reardon, J., concurred.

---

[4]Plaintiffs contend the trial court erred when it granted Fort Bragg's ex parte application for leave to file an untimely motion for judgment on the pleadings. The statute—Code of Civil Procedure section 438, subdivision (e)—authorizes the trial court to permit late filings of such motions and does not specify any grounds which might serve to limit its power to do so. (See *ante*, fn. 1, p. 17.) It is evident that whether to grant such leave is a matter residing in the trial court's discretion to control litigation before it. Here, it is clear from the record the City's delay in seeking judgment on the pleadings stemmed from its original counsel's chronic heart condition, a condition that forced his withdrawal in this case and the substitution of new counsel. We find no error in permitting the motion to be filed.